UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN M. KOWALYSHYN, *et al.*,
    *Plaintiffs*,

v.

EXCELSIOR INSURANCE COMPANY, *et al.*
    *Defendants*.

No. 3:16-cv-00148 (JAM)

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This case is brought by plaintiff homeowners, Shawn and Kim Kowalyshyn, against their homeowner insurance providers, Peerless Insurance Company and Kemper Independence Insurance Company. Plaintiffs allege that their insurers failed to pay for damages to the basement walls of their home caused by cracking and deteriorating concrete. Plaintiffs allege that this constitutes a breach of contract, a breach of the implied covenant of good faith and fair dealing, and unfair practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA). Both insurers have moved for summary judgment on all of plaintiffs' claims. For the reasons described below, I will grant Peerless's motion for summary judgment in its entirety, and grant in part and deny in part Kemper's motion for summary judgment.

## BACKGROUND

Plaintiffs purchased a home in Willington, Connecticut in July of 2007. Doc. #51 at 2. The home has a concrete foundation, as well as a second concrete foundation wall covering the original foundation. Doc. #62-3 at 6. In connection with this purchase, plaintiffs commissioned a home inspection report. *Id.* at 4. The report did not note cracking in the foundation, but did note the presence of the second concrete foundation wall. Doc. #69-1 at 20. The home inspector wrote

that it appeared that the second wall had been poured as a result of damage caused by backfilling. *Id.* Plaintiffs were aware that a second foundation wall had been poured but did not believe this reflected that the home was structurally unsound. Docs. #62-3 at 6, #62-4 at 5.

Plaintiff Shawn Kowalyshyn was aware of minor, hairline cracks in the exterior foundation at the time he purchased the house in 2007. Doc. #62-3 at 6. Plaintiffs purchased a homeowners' insurance policy from Peerless for the period of July 2007-July 2008.[1] Doc. #51 at 2. Plaintiffs later purchased a homeowners' insurance policy from Kemper that began in November 2007 and continues to the present. *Id.* at 11.

Plaintiffs first noticed extensive cracking in the basement walls of their home in August 2015 after they learned from news reports about widespread problems of defective concrete used to build homes in Connecticut. Doc. #51 at 2. An investigation of the cracking revealed that the basement was constructed with defective concrete that likely originated from J.J. Mottes Concrete Company. *Id.* at 3. This concrete includes a high level of pyrrhotite, which causes swelling and cracking in the concrete when exposed to oxygen and water. The basement walls will continue to deteriorate and eventually crumble as a result of the faulty concrete. *Ibid*.

Plaintiffs' expert evaluated the home on April 12, 2016. *Ibid*. The only way to salvage the home would be to replace the foundation, which is projected to cost approximately $200,000. *Id.* at 5.

Plaintiffs notified Peerless of the condition on September 23, 2015. *Id.* at 4. Peerless's policy covers "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . (f) Use

---

[1] Peerless maintains for the first time in its reply brief that it insured the property for only four months in 2007. Doc. #77 at 2. I assume for the purposes of this ruling that the policy applied from July 2007-July 2008, although my ruling in this case would be the same regardless.

of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation." Doc. #51-1 at 10. On September 25, 2015, Peerless denied coverage for the claim. Doc. #51-2. The denial letter noted that Peerless only covered the home for the year of 2007-2008 and that Peerless could no longer inspect the damage that had occurred as of that time. *Id.* at 2. The letter also cited a series of exclusions under the policy, but did not clarify or explain which exemptions Peerless believed applied or why.

Plaintiffs notified Kemper of the condition on September 22, 2015. Doc. #51 at 12. Kemper's policy also covered collapse in its "Additional Coverages" section, although the definition of collapse was amended during the course of coverage in 2011. One definition of "collapse" applied for 2007-2011, and an updated definition applies from 2011 forward.[2] Kemper's old policy from 2007-2011 covered collapse that caused "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . (f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation." Doc. #51-3 at 15. The policy clarified that collapse did not include "settling, cracking, shrinking, bulging or expansion." *Ibid.* In a section entitled "Perils Insured Against," the policy covered all "risks of direct loss" to covered property with specific enumerated exclusions. Doc. #51-3 at 17. The exclusions included loss caused by "inherent vice, latent defect" or "settling, shrinking, bulging or expansion, including resultant cracking" of "foundations, walls, floors." *Id.* at 18. In another section entitled "Exclusions," the

---

[2] It is not clear from the record precisely when this change in definition took place. The term of the original Kemper policy was November 2007-November 2008. Doc. #51-3 at 2. And Kemper states that the term for the 2015-2016 policy was from June 2015-June 2016. Doc. #61 at 8. Given that these policies both began mid-year, it appears that the 2011 policy change probably applied mid-year as well.

policy excluded coverage for "faulty, inadequate or defective . . . materials used in … construction." *Id.* at 21.

Kemper's new policy from 2011 and onward altered the definition of "collapse" to be "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Doc. #61-2 at 3. The policy stated that "collapse" did not extend to a structure that is merely "in danger of falling down or caving in" or one that "shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." *Ibid.*

Kemper conducted an investigation of plaintiffs' claim, including an inspection of the home on September 28, 2015. Doc. #51-4 at 2. Kemper denied coverage for the claim on January 14, 2016. Doc. #51-4. Kemper's denial letter cited multiple reasons as the basis for denial and explained why Kemper believed that the claim was not covered under its policy. *Id.* at 7-8.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Peerless Insurance Company*

Peerless argues that even if plaintiffs' loss would otherwise be covered under the policy, there is no dispute of material fact that the loss did not occur during the very limited period of time that its policy was in effect for plaintiffs. Peerless's policy includes a provision limiting coverage for "property damage" that "occurs" during the policy period. Doc. #51-1 at 21. The relevant loss in this case is the collapse of plaintiffs' home. I assume for purposes of this argument that "collapse" in the Peerless policy includes "substantial impairment of the structural integrity" of the home. *See Beach v. Middlesex Mut. Assur. Co*., 205 Conn. 246, 252 (1987); *see also Roberts v. Liberty Mut. Fire Ins. Co*., 264 F. Supp. 3d 394, 409 (D. Conn. 2017) (discussing widespread adoption of *Beach* standard and "in the absence of a contrary policy definition—a building has 'collapsed' by suffering a substantial impairment of structural integrity if it would have caved in had the plaintiffs not acted to repair the damage") (internal quotation marks and brackets omitted). I further assume that the extensive map cracking in plaintiffs' foundation constitutes substantial impairment of the structural integrity of plaintiffs' home. Nevertheless, I agree with Peerless that there is no dispute of material fact that any collapse can be proved to have occurred during the narrow time frame in which Peerless insured plaintiffs' home.

Plaintiffs do not know precisely when the substantial cracking in their basement concrete took place. Plaintiffs' expert indicated that he had previously testified that a foundation with this type of defective concrete would be substantially impaired after 10 to 14 years, which would place the map cracking during the years of 1999-2003. Doc. #62-5 at 8-9. Plaintiffs' expert further testified that, given his experience with this concrete condition, he believed that the map cracking would have been present in plaintiffs' foundation walls by 2007. *Id.* at 10. But he also noted that the 2007 home inspector report did not mention the cracking, which he believes the

5

inspector would have noted had the cracking been present at the time. *Id.* at 12. Additionally, plaintiff Shawn Kowalyshyn testified that he only noticed minor spider cracking in the walls in 2007. Doc. #62-3 at 6. The expert further testified that he determined "with a high degree of engineering certainty" that the condition occurred at least five years prior to his 2016 inspection of plaintiffs' home. Doc. #62-5 at 27. He therefore concluded that the substantial cracking must have occurred at some point between the time of the 2007 home inspection report and 2011. *Id.* at 28.

Even construing all of the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the substantial impairment occurred between July 2007-July 2008. Accepting the expert's testimony as true that there was no unusual cracking in 2007 and that the map cracking was present by 2011, a jury would have no basis other than guesswork to conclude that the substantial impairment had occurred by July 2008. Plaintiffs' expert did not place the substantial impairment in this narrower time frame, and plaintiffs have provided no further evidence that would allow a jury to reach such a conclusion.

To avoid this problem, plaintiffs argue that I should apply a "multiple injury trigger" analysis which would allow for coverage under any policies in effect "where there has been an exposure to a cause of injury, an injury in fact, or when an injury manifests." Doc. #68 at 11 (citing *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 697 n.12 (2003)). Because the concrete has been deteriorating since the foundation was originally poured, plaintiffs argue that they were "exposed" to the cause of the injury for that entire period, including for Peerless's policy period.

I don't agree. It is true that Connecticut courts have applied an "exposure" trigger in cases involving "progressive, long latency diseases such as asbestosis and mesothelioma." *R.T.*

6

*Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co*., 171 Conn. App. 61, 158 (2017) (explaining that the continuous trigger theory applies to the distinct problem of "long-tail toxic tort claims"). Such diseases "continually reinjure the body for decades after initial exposure, and because those injuries are considered to be indivisible—their progression and magnitude during any particular policy period are impossible to quantify." *Ibid.*

But unlike cases involving gradual environmental contamination or gradual progression of a disease, coverage for defective concrete foundation cases is not triggered until there is a "collapse"—that is, until the point when the structure of the home became substantially impaired. The "collapse" itself did not occur innumerable times over the years, unlike the injuries or losses in environmental or disease cases. *See also Maryland Cas. Co. v. W.R. Grace & Co.,* 23 F.3d 617, 627 (2d Cir. 1994) (noting the difficulty of importing "concepts of bodily injury . . . into the property damage context" and distinguishing installation of asbestos building products with other "types of property damage—such as the gradual contamination of earth and groundwater by leaking landfills—[that] may be analogous to the slow progression of diseases such as asbestosis and cancer"). I conclude that the Peerless policy was not triggered merely by the fact that plaintiffs were "exposed" to injury because their foundations were built with defective concrete.[3]

Because no reasonable jury could find that the collapse occurred during the policy period, Peerless was not obligated to plaintiffs. And because Peerless did not breach its policy contract, plaintiffs' other claims against Peerless necessarily fail. "In the absence of a breach of an express

---

[3] Not to the contrary is *Roberts v. Liberty Mut. Fire Ins. Co*., in which Judge Underhill cited and applied the "continuous trigger theory" to a defective concrete claim, but only by way of concluding that "the concrete deterioration 'became manifest' in 2012, within the period of Liberty Mutual's coverage," 264 F. Supp. 3d at 401 n.3, without more broadly suggesting—as plaintiffs argue here—that coverage is triggered by mere "exposure" to the cause of injury from the fact that defective concrete was used in the first place and continued to be in the foundation while the Peerless policy was in effect. Plaintiffs here have not otherwise established a genuine fact issue to show that the substantial impairment was manifest during the limited Peerless policy period.

duty under the insurance policy, … there is no independent cause of action for the breach of the implied covenant of good faith and fair dealing." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014) (citing *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 801 (2013)). Similarly, "a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract." *Roberts*, 264 F. Supp. 3d at 416. Because I conclude that no reasonable jury could find that Peerless breached its contract, plaintiffs' claims that Peerless violated the implied covenant of good faith and fair dealing and CUTPA/CUIPA also fail. Accordingly, I will grant Peerless's motion for summary judgment in its entirety.

### *Kemper Independence Insurance Company*

Plaintiffs allege that the structural integrity of their home has been substantially impaired, that this occurred during the years of 2007-2011, and that such substantial impairment constitutes collapse with the meaning of Kemper's 2007-2011 policies. Kemper does not dispute that the extensive cracking in the foundation of plaintiffs' home would constitute substantial impairment of the structural integrity of plaintiffs' home. But Kemper argues that no reasonable jury could conclude that the substantial impairment occurred during the 2007-2011 period when its pre-amended definition of "collapse" applied. Kemper further argues that its updated collapse definition of the 2011-2016 policy applies, which undisputedly bars coverage for substantial impairment. In addition, Kemper claims that even if the older definition of collapse applies, its policy contains several exclusions that operate to bar coverage for plaintiffs' loss.

*Timing of the substantial impairment*

As I explained above, construing all of the evidence in the light most favorable to plaintiffs, there is at least a material dispute of fact as to whether the extensive cracking in the foundation occurred prior to 2007, between 2007-2011, or after 2011. Although Kemper

emphasizes the expert's testimony in other cases that the cracking would have occurred 10-14 years after the concrete was poured, there is other evidence in this case from which a reasonable jury could conclude that the cracking occurred later. *See Metsack v. Liberty Mut. Fire Ins. Co.*, 2017 WL 706599, at *6 (D. Conn. 2017) (denying summary judgment where defendant argued that there was no dispute because plaintiffs' expert—the same as in this case—testified in other cases about the 10-14 year period and holding that there was enough other evidence, including plaintiff's testimony that she did not notice the cracks in her home until later, to create a dispute of material fact as to timing). As such, I find that a reasonable jury could conclude that the substantial impairment occurred during the several years that elapsed from 2007-2011 at which time the older version of the Kemper policy and its pre-amended definition of "collapse" was in force.

*Cracking Exclusion*

Kemper argues that plaintiffs' home did not "collapse" within the meaning of its policy because the policy excludes "settling, cracking, shrinking, bulging or expansion" from the definition of collapse. Doc. #51-3 at 15. I reject this argument on the ground that this exclusion is ambiguous for the reasons stated by Judge Underhill when he considered the same exclusion in *Agosti v. Merrimack Mut. Fire Ins. Co.*, 2017 WL 3710786, at *4-5 (D. Conn. 2017) (noting in part that "the language of the 'cracking' exclusion is fairly susceptible to being interpreted as not including mere settling or cracking, but including settling or cracking that results in substantial impairment of a home's structural integrity") (internal quotation marks omitted).

*Fortuitous Loss Limit*

Kemper next argues that its insurance policy is an "all-risk" policy as to property damage that only covers fortuitous and extraneous events and that plaintiffs' loss is not a fortuitous loss.

9

But Kemper's policy as it relates to its collapse coverage is not an all-risk policy. An all-risk policy is one that "insure[s] against all risks unless explicitly excluded." *City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 41 (2d Cir. 2003). While it is true that some of the coverage provided under the policy, including Coverages A and B, are all-risk, the "collapse" provision under "Additional Coverages" is clearly not. The collapse provision states that the policy covers "direct physical loss to covered property involving collapse . . . caused only by one or more of the following," then lists six causal agents that trigger coverage, including hidden decay. This is "named-perils" coverage rather than "all-risk" coverage. *See Fabozzi v. Lexington Ins. Co.,* 639 F. App'x 758, 760 (2d Cir. 2016) (distinguishing between "all-risk" and "named-perils" coverage and explaining that an identical "collapse" provision in a policy with an identical structure was properly characterized as named-perils coverage rather than all-risk coverage). Therefore, whether plaintiffs' claim is covered depends on whether a "collapse" occurred and whether it was caused by one of the enumerated covered triggers. Kemper's argument about fortuitous or accidental loss under all-risk policies is inapposite.

Notably, this case is distinguishable from defective concrete cases holding that coverage was barred where the insurance policy included specific language requiring that the collapse be "sudden and accidental." *See, e.g.*, *Metsack*, 2017 WL 706599, at *7 (holding that policy language defining collapse as "sudden and accidental" precluded coverage in a defective concrete case and noting that "while *Beach* and the numerous JJ Mottes concrete cases that have been heard in this district have held that a collapse need not be 'sudden' to be covered, none of the policies evaluated included the word 'sudden' within their 'collapse' provisions."). Kemper has not pointed to any provision in its 2007-11 policy with similar language.

*Suit Against Us Limitation*

Kemper further argues that plaintiffs' claim is barred by the policy's "Suit Against Us" limitation provision which requires that any action be brought "within one year after the date of loss." Doc. #51-3 at 23. Kemper argues that there is no dispute that the loss occurred and that plaintiffs knew of the loss more than one year before plaintiffs initiated the instant suit in February of 2016. Courts in this district have "determined on multiple occasions that the 'date of loss' for purposes of an insurance policy's 'Suit Against Us' provision is the date on which the insured learned or should have learned of the covered loss." *Belz v. Peerless Ins. Co*., 204 F. Supp. 3d 457, 465-66 n.2 (D. Conn. 2016) (citing cases).

Construing the evidence in the light most favorable to plaintiffs, I conclude that a reasonable jury could find that plaintiffs only learned or should have learned of the collapse of their home in August 2015, which was less than one year before they filed this suit. Contrary to Kemper's assertions, neither their knowledge of a double pour foundation wall nor their knowledge of minor, hairline cracking establishes that plaintiffs knew or should have known that the structural integrity of their home was substantially impaired. Plaintiffs testified that they only learned of the extensive cracking in 2015, when they checked their home after hearing about the concrete problem in the news. Plaintiffs' position is further supported by the fact that the original foundation wall was largely hidden from view, suggesting that a reasonable person would not have known of this problem earlier. *See Belz*, 204 F. Supp. 3d at 466 n.2 (denying summary judgment where "the fact that the cracks were obscured from view . . . combined with the early engineer's reports that the cracks did not threaten the structural integrity of the home, suggest that the [plaintiffs] could not have known of the 'collapse' any sooner than 2013"). Accordingly, there is at least a dispute of material fact as to whether plaintiffs should have known of the

collapse prior to the summer of 2015 such that the "Suit Against Us" limitation would bar coverage for their claim.

*Latent Defect/Faulty Materials Exclusions*

Kemper further argues that plaintiffs' loss is excluded under policy exclusions for damage caused by "wear and tear, marring, deterioration" or "inherent vice, latent defect." Doc. #51-3 at 18. These exceptions are found in "Section I – Perils Insured Against" of the policy. *Id.* at 17. This section opens by stating, "We ensure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:" and proceeds to list enumerated exclusions. This section is a prototypical "all-risk" policy that covers all risks to the property described in Coverages A and B but for the specific risks excluded by this section. The policy clarifies for these exclusions that "any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered." *Id.* at 18.

Kemper also argues that the exclusion for "faulty, inadequate, or defective… construction" applies. This exclusion appears in provision 2.c. of "Section I – Exclusions." Doc. #51-3 at 20-21. This provision opens by stating, "We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered." *Id.* at 20.

The clear reading of these sections is that the exclusions therein do not apply to limit coverage granted in the "Additional Coverage" section. The "Additional Coverage" section serves as "a coverage-restoring exception to Coverage A's exclusions." *Fabozzi v. Lexington Ins. Co.*, 23 F. Supp. 3d 120, 125 (E.D.N.Y. 2014) (describing a collapse provision in an "Additional Coverages" section). Both the "inherent vice, latent defect" and "faulty materials" exceptions

limit coverages granted in Coverages A and B, but do not refer to the separate "Additional Coverages" section. *See also Sirois v. USAA Cas. Ins. Co.*, 2017 WL 3726468, at *5 (D. Conn. 2017) (similar policy exclusions did not clearly apply to "collapse" coverage granted in an "Additional Coverages" section).

Furthermore, the "ensuing loss" provisions of the exclusions mean that a loss that results from a covered event that "ensues" from one of the exclusions is covered under the policy. In *Beach*, the Connecticut Supreme Court interpreted a similar "ensuing loss" provision and held that the provision could "reasonably be understood to have contemplated coverage for a 'collapse' that follows consequentially from excluded activity." *Beach*, 205 Conn. at 252; *see also Roberts*, 264 F. Supp. 3d at 413. Thus, as commentators have noted, "[w]here a policy provides coverage for 'collapse' caused by otherwise excluded causes of loss, the coverage prevails over the general exclusion in another part of the policy. . . . In other words, exclusions in the main body of the policy will generally not apply to eliminate coverage for the extended coverage of collapse." Paula B. Tarr *et al.*, *Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories*, 35 Tort & Ins. L.J. 57, 76 (1999).

I conclude that there is at least a material dispute of fact as to whether plaintiffs' loss occurred during Kemper's policy period and whether the policy covers their loss. Accordingly, a reasonable jury could find that Kemper breached its policy by failing to pay plaintiffs' for the collapse of their home. I will therefore deny Kemper's motion for summary judgment as to Count Four (Breach of Contract).

*Implied Covenant of Good Faith and Fair Dealing*

Kemper argues that even if it breached its contract by failing to pay plaintiffs, no reasonable jury could conclude that it did so in bad faith. Because plaintiffs have shown a

material dispute regarding whenever they are entitled to an express benefit under Kemper's policy, "the question becomes whether the record supports finding that [the insurer] acted with actual or constructive fraud, a design to mislead, or have acted with neglect or refusal to fulfill its duties." *Metsack*, 2017 WL 706599, at *8 (citation and questions omitted). Absent such indicia, "it is not bad faith for an insurer to fight liability when policy coverage is unclear." *Am. Nat'l Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 271 (2d Cir. 1995).

I find that plaintiffs have not have shown a material dispute of fact that Kemper has engaged in bad faith. Plaintiffs' allegations of bad faith rest principally on "the fact that Kemper denied the instant claim based upon an incomplete coverage analysis and a reliance on a position consistently rejected by the courts in Connecticut." Doc. #68 at 25. Plaintiffs allege that, although Kemper's letter cited the updated collapse provisions that had been in place for five years, its analysis was "incomplete" because it did not fully analyze the applicability of the older collapse definition. Additionally, plaintiffs allege that it was bad faith to cite the "foundation" exception in the letter, "thereby utilizing an interpretation of the term 'foundation' that has been universally rejected by the State and Federal Courts in Connecticut in the context of these concrete decay claims." *Id.* at 24.

Given that the updated definition of collapse had been already operative for several years by the time plaintiffs filed their claim, I do not think a reasonable jury could find that Kemper acted in bad faith by principally relying on the updated definition. Nor is it bad faith for an insurer to rely on an interpretation of a policy that "has not prevailed so far" in the courts so long as it is not "unreasonable on its face under existing insurance law." *Roberts*, 264 F. Supp. 3d at 415. "Until such time as those arguments are rejected by Connecticut's appellate courts or the Second Circuit, [defendant insurer] is entitled to continue making them." *Ibid.* I will therefore

14

grant Kemper's motion for summary judgment as to Count Five (breach of implied covenant of good faith and fair dealing).

*CUTPA and CUIPA*

In order to sustain a CUTPA/CUIPA claim, a plaintiff must allege that a defendant engaged in conduct prohibited by CUIPA and that the act proximately caused the plaintiff's harm. *See Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 165 (D. Conn. 2014). If a plaintiff premises a CUTPA claim on a defendant's unfair claim settlement practices, the plaintiff must "allege that the defendant has committed the alleged proscribed act with sufficient frequency to indicate a general business practice." *Ibid.*

Plaintiffs have failed to show that Kemper's liability under its policy was "reasonably clear." The existence of other nonbinding decisions that the insurer is "potentially liable would not make it 'reasonably clear' that [the insurer] actually was liable, and so could not persuade a reasonable jury to find that [the insurer] violated CUTPA/CUIPA." *Roberts*, 264 F. Supp. 3d at 416. This is especially true here, where plaintiffs reported the collapse in 2015, and Kemper's policy included an updated "collapse" definition that barred coverage for substantial impairment that had been in effect since 2011. Because plaintiffs have not introduced any other evidence to support their CUTPA/CUIPA claim, I will grant Kemper's motion for summary judgment with respect to Count Six (CUTPA and CUIPA claim).

## CONCLUSION

Defendant Peerless's motion for summary judgment (Doc. #63) as to Counts One, Two, and Three is GRANTED. Defendant Kemper's motion for summary judgment (Doc. #60) is GRANTED in part and DENIED in part. Kemper's motion is DENIED as to Count Four (breach

15

of contract) but GRANTED as to Count Five (Breach of the Implied Covenant of Good Faith) and Count Six (CUTPA and CUIPA). Trial shall proceed solely on Count Four against Kemper.

It is so ordered.

Dated at New Haven this 13th day of February 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge